UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SN 7057

YAKIM RUSSELL,

Petitioner,

-against-

HAROLD GRAHAM, SUPT.,

Respondent.

AFFIDAVIT IN OPPOSITION TO PETITION FOR A WRIT OF HABEAS CORPUS

CV-06-5730 (JG)

STATE OF NEW YORK )
) SS:
COUNTY OF KINGS )

SOLOMON NEUBORT, duly affirmed, deposes and states as follows:

1. I am an Assistant District Attorney of counsel to Charles J. Hynes, the District Attorney of Kings County. I am admitted to practice in New York State and before this Court.

2. By agreement with the Attorney General of the State of New York, the District Attorney of Kings County will represent the respondent in the above-captioned matter.

3. This affidavit is submitted in opposition to the pro se application of petitioner (hereinafter, "defendant") for a writ of habeas corpus, dated October 18, 2006.

4. The following statements are made on information based on the records and files of the Kings County District Attorney's Office.

5. On March 20, 1997, at about 9:00 p.m., on the fourth floor hallway of the apartment building at 405 Williams Avenue in Brooklyn, defendant, together with two other armed accomplices, shot and killed Omar Jenkins and shot Frederick Benbury in his waist. Omar Jenkins sustained fourteen bullets to his body.

6. For the above acts, defendant was charged, under Kings County Indictment Number 3692/00, with two counts of Murder in the Second Degree (N.Y. Penal Law § 125.25[1], [2]), one count of Attempted Murder in the Second Degree (N.Y. Penal Law §§ 110.00/125.25[1]), two counts of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03[2]), two counts of Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02[4]), and one count of Reckless Endangerment in the First Degree (N.Y. Penal Law § 120.25).

7. The following is a summary of the evidence adduced at defendant's jury trial:

Defendant, who was known by the nickname "YaYa," grew up together with Jermaine Brown; Mark Crowder, who was known by the nickname "Killer"; Jatike Jackson, who was known by the nickname "Japiese"; and Omar Jenkins, who was known by the nickname "Oh-

Dog" (Brown: 277-79, 308-09).[1] One day, during the beginning of March 1997, defendant smashed a Champagne bottle over Omar Jenkins' head during a party at a club (Brown: 280, 332-34).

During the evening of March 20, 1997, Lamont Reese, who went by the nickname "Mezo," came home to the apartment that he shared with his sister Monique Reese at 405 Williams Avenue, Apartment 4-O (Reese: 213, 227). Lamont was accompanied by Omar Jenkins, Frederick Benbury, and another man, whose name Monique did not know (Reese: 213, 227). Lamont informed Monique that he was going to his room to change his clothes (Reese: 214). Monique asked her brother to throw out the coffee table when he left (Reese: 214). About fifteen minutes later, when Monique saw Lamont and his friends leaving the apartment without taking the coffee table with them, she ran after them to the front door (Reese: 215, 224). When Monique opened the door, "bullets rang out," and she pulled her brother back into the apartment (Reese: 215, 224). Lamont's friend whose name Monique did not know also returned to the apartment and shouted that they had shot his friend (Reese: 216). As Monique was closing the door, she saw someone, whom she believed was Mr. Benbury, run past the apartment (Reese: 215-19, 225). Ms. Reese heard three series of gunshots emanate from the

[1] Unless otherwise indicated, numbers in parentheses refer to the pages of the trial transcript. Numbers in parentheses preceded by "S." refer to the pages of the sentencing transcript. Names in parentheses preceding page references refer to the names of the witnesses whose testimony is cited.

incinerator and elevator area of the hallway (Reese: 233). Ms. Reese did not see any weapons in the hands of Lamont or his friends before they left the apartment and did not see Lamont or his friend with any weapons in their hands when they returned to the apartment during the shooting (Reese: 216-17, 220). Ms. Reese called 911 (Reese: 226).

Meanwhile, that evening, at about 8:55 p.m., Joanne Adams left her sister Joyce Haines' apartment on the fifth floor of the building at 405 Williams Avenue and went to visit her daughter in her apartment down the hall (J. Adams: 517, 521, 533, 551, 563, 575). When no one answered the door, Ms. Adams left (J. Adams: 521, 551, 563). Ms. Adams, who was a crack addict who had not yet ingested any crack that day, then headed downstairs with her friend Kathy to ingest some crack (J. Adams: 524, 537). As they approached the fourth-floor stairwell, Ms. Adams saw defendant, Jatike Jackson, and Mark Crowder, all armed with guns on the fourth floor landing, peering through the glass window in the door to the fourth floor hallway (J. Adams: 517-18, 521, 522-23, 533, 552-56, 563). Defendant shouted a warning to the women to go back upstairs and use the building's other staircase (J. Adams: 518, 533, 556-57, 563-64). Ms. Adams and Kathy climbed back up to the fifth floor; Kathy went through the doorway into the hallway; and the door slammed behind her (J. Adams: 518-19, 534). Ms. Adams, who remained behind in the fifth floor stairwell, climbed back

down the steps to midway between the fourth and fifth floor stairwell and looked down to the fourth floor stairwell (J. Adams: 519, 534-35, 556-57). Ms. Adams saw defendant, Mr. Crowder, and Mr. Jackson still standing there (J. Adams: 535, 537). Ms. Adams heard a door on the fourth floor shut and Omar Jenkins and another man talking (J. Adams: 519, 573-74). Ms. Adams then heard defendant say, "Let's do this" (J. Adams: 519, 557-58, 564). Defendant, Mr. Crowder, and Mr. Jackson then ran through the door into the hallway, and several shots were fired (J. Adams: 519, 537, 557-58). Ms. Adams ran down the fifth floor hallway to the opposite staircase and ran down to the third floor when she remembered that her daughter was on the fifth floor (J. Adams: 519, 558). Ms. Adams climbed back up to the fifth floor (J. Adams: 519-20, 558). When she arrived at the fifth floor, she observed defendant -- who was the father of her daughter's baby -- leaving her daughter's apartment, which was immediately adjacent to the staircase she had earlier descended with Kathy (J. Adams: 520-21, 537-38, 558).

Meanwhile, at about 9:00 p.m., Jermaine Brown left the apartment of a friend who lived in apartment 5-C at 405 Williams

Avenue (Brown: 281-82, 341).[2] Mr. Brown climbed partway down the staircase from the fifth to the fourth floor and was urinating in the stairwell when he heard two series of rapid gunshots emanating from nearby (Brown: 282-83, 331-32, 342-43).[3] Mr. Brown fled from the building through the building's exit on Williams Avenue and ran to the corner of Williams and Blake Avenues (Brown: 283-84, 343). Less than a minute later, Fred Benbury, who went by the nickname "Pop," ran out of the same doorway through which Mr. Brown had fled (Brown: 284, 336-37, 339, 344, 346). Mr. Benbury ran up to Mr. Brown and exclaimed hysterically that "Killer shot me; Killer shot me; son, Killer shot me" (Brown: 284, 304, 339-

[2] When Mr. Brown was fifteen years old, he was convicted of statutory sodomy for having oral sex with his fourteen-year old girlfriend and was sentenced to one year in a juvenile facility (Brown: 290-92, 324). While in the facility, someone stabbed him in the arm with an ice pick, and he beat up that person two days later, for which he was convicted of third-degree assault and for which he did not serve any additional time (Brown: 292, 325). After being released from the facility, Mr. Brown resumed the romantic relationship with his girlfriend (Brown: 293, 324). During October 1998, Mr. Brown acted as a lookout during a robbery committed by Ruking Cummings, who went by the nickname "Psycho" (Brown: 294-97, 321-22, 349-52). Mr. Brown aided in the robbery because Mr. Cummings, who was armed with a gun, threatened him (Brown: 321-22, 369-70). As a result, Mr. Brown was convicted of first-degree robbery, and he agreed to testify truthfully in this case and waive his right to appeal from the robbery conviction in exchange for the prosecutor's promise to recommend a five year prison sentence on that conviction (Brown: 297-301, 325-30, 372-73). Mr. Brown was also previously convicted of a misdemeanor for unauthorized use of a vehicle for being a passenger in a stolen car (242-43; Brown: 302-03).

[3] Mr. Brown was on the opposite staircase from the one Joanne Adams was on during the shooting (Brown: 305; sketch of hallway, entered into evidence as People's Exhibit Two [124]).

40). Mr. Benbury also said that he had to get to his "P's," which is slang for projects (Brown: 285). Mr. Benbury, who had stopped for only a few seconds to talk to Mr. Brown, then continued down Williams Avenue toward Sutter Avenue (Brown: 286, 288, 346). Mr. Benbury was bleeding from his the left side of his waist (Brown: 285). About a minute after Mr. Benbury left, Mr. Brown saw the police arriving at 405 Williams Avenue (Brown: 286, 338, 346-48). Mr. Brown later saw Mr. Jenkins being carried on a stretcher out of the building and into an ambulance (Brown: 287, 303, 338, 364). At about 8:55 p.m., Police Officer JAMES M. FAGAN and his partner Officer Kenneth Anderson received a radio transmission directing them to go to 405 Williams Avenue (Fagan: 108-09, 120). About a minute later, the officers arrived at 405 Williams Avenue, and they climbed the stairs to the fourth floor where they observed Emergency Medical Technicians treating a man lying on the ground who had been shot (Fagan: 109-10). Officer Fagan later learned that the man lying on the ground shot was Omar Jenkins (Fagan: 110). Officer Fagan also observed bullet shell casings on the floor (Fagan: 110). Officers Fagan and Anderson cordoned off the crime scene area to prevent unauthorized people from disturbing the evidence (Fagan: 110, 113, 120).

At about 9:00 p.m., Jerome Jewet, an Emergency Medical Technician, went to 320 Miller Avenue, Apartment 1-D, where he

treated Frederick Benbury for a gunshot wound to his abdomen and then transported him to Brookdale Hospital (Jewet: 417-21).

At about 9:50 p.m. that evening, Detective Michael McNally went to 405 Williams Avenue and canvassed the building for witnesses to the shooting of Omar Jenkins (McNally: 169-70). During the canvass, Detective McNally learned that defendant, who lived in apartment 5-D of that building, had been involved in the incident (McNally: 171). Detective McNally also learned that Christine Adams was defendant's girlfriend and that she lived in Apartment 5-E (McNally: 174; Adams: 198-99).

Detective McNally asked Ms. Adams for consent to search her apartment for defendant and for weapons (McNally: 173-74; Adams: 202-03). Ms. Adams consented to the search and signed a consent form (McNally: 173-75; Adams: 202-03). At about 2:00 a.m., Detective McNally searched the apartment and recovered three guns from under a mattress in a baby crib (McNally: 177). One of the guns was a .38 caliber revolver, one was a .25 caliber automatic with one live round in it, and one was a .380 caliber semiautomatic gun (McNally: 178). Detective McNally photographed the guns, vouchered them, and sent them and the ballistic evidence later recovered from the building's hallway to the police ballistic lab for testing (McNally: 179, 185-87, 188).

At about 11:20 p.m., Detective Corinne Currie, of the Police Department's Crime Scene Unit, arrived at the fourth floor of 405

Williams Avenue where he observed bloody clothing and discharged bullets and shell casings (Currie: 122-23). Altogether, there were sixteen bullets and shell casings: one .38 caliber bullet, six .380 caliber shell casings, one .25 caliber bullet, and eight .25 caliber shell casings (Currie: 125-140, 144-46 153). Detective Currie also observed three bullet impact marks on the wall opposite the stairwell near the elevators (Currie: 135-36). Detective Currie marked off the areas where the bullets shell casings were lying and drew a sketch of and photographed the crime scene, indicating the positions of the ballistic evidence and the bullet impact marks (Currie: 124-29). Detective Currie collected the ballistic evidence and gave them to an officer to voucher (Currie: 124-29, 137). The evidence consisted of ballistics discharged from a nine-millimeter gun, a twenty-five caliber automatic gun, and a .38 caliber automatic gun (Currie: 130, 143). That night, Police Sergeant Joseph Klobus went to Brookdale Hospital and spoke to Frederick Benbury's sister who told him that there was clothing Mr. Benbury had left behind at his apartment at 320 Miller, Apartment 1-D, in the Pitkin Projects (Klobus: 392-95, 404). Sergeant Klobus went to the apartment and recovered two stained shirts and a jacket, which he vouchered and asked an officer to send to the police lab for serology and ballistic testing (Klobus: 392-405).

On March 21, 1997, at about 2:00 p.m., Mr. Brown was at the park on Williams Avenue, between Blake and Dumont Avenues, with defendant and Mark Crowder (Brown: 288). Defendant asked, "Did you see how I made the movie, how I shot O-Dog, did you see how I made the movie?" (Brown: 288, 316-20, 368). "Making a movie" is slang for shooting or stabbing someone (Brown: 288-89, 374). In response, Mark Crowder smirked and nodded twice in the affirmative (Brown: 290).

Also at about 2:00 p.m. that day, Officer Fagan and Omar Jenkins' Mother, Lousie Brown, went to the Kings County Medical Examiner's Office at the city morgue where they identified, from a photograph, the deceased remains of Omar Jenkins (Fagan: 111; Brown: 161).

At some point, Ms. Adams attempted to report to the police that she had witnessed the shooting, but the police ignored her (J. Adams: 540-41). On October 15, 1999, after being arrested for prostitution, Joanne Adams again reported to the police that she had witnessed the shooting (Maher: 442; J. Adams: 523).[4]

[4] Ms. Adams, who was addicted to cocaine, had a felony conviction for attempted third-degree criminal sale of a controlled substance and two misdemeanor convictions for possession of a controlled substance (J. Adams: 524-25). Ms. Adams had served as a prostitute to support her drug-addiction (J. Adams: 526). Ms. Adams was not promised any leniency on her prostitution charge in exchange for her testimony (J. Adams: 531).

Doctor Beverly Leffers, a medical examiner and an expert forensic pathologist, performed an autopsy on the deceased remains of Omar Jenkins (Leffers: 581-582). Mr. Jenkins had sustained fourteen gunshot wounds to his right arm, torso, legs, and penis (Leffers: 585). Mr. Jenkins died from the gunshot wounds (Leffers: 604). Doctor Leffers recovered nine bullets from the body of Mr. Jenkins (Leffers: 600).

Detective Joseph A. Ramirez, a ballistics expert, determined that the sixteen cartridge casings recovered from the scene of the shooting comprised, six .380 cartridge casings, nine .25 caliber cartridge casings, and one .38 caliber bullet that had been fired from a revolver (Ramirez: 628-29). Detective Ramirez also determined that the three guns recovered from Christine Adams' apartment were a .38 caliber Rohm revolver, a .380 caliber Lorcin semi-automatic pistol, and a .25 caliber Phoenix Arms semi-automatic pistol (Ramirez: 631-32). The Rohm pistol was operable and had evidence of having been fired at least six times; the Lorcin and the Phoenix arms, too, were operable and had evidence of having been fired (Ramirez: 633-36). Detective Ramirez test fired the guns and determined that the .38 caliber bullet recovered from the scene of the shooting had been fired from the Rohm, to the exclusion of all other firearms (Ramirez: 640). The .25 caliber cartridges recovered from the scene of the shooting were fired from the Phoenix Arms, to the exclusion of all other

firearms (Ramirez: 646). The .380 caliber cartridges were consistent with having been fired from the Lorcin (Ramirez: 644). The .38 caliber bullets recovered from the body of Mr. Jenkins were fired from the Rohm, to the exclusion of all other firearms (Ramirez: 649). The .25 caliber bullets recovered from the body of Mr. Jenkins were fired from the Phoenix arms, to the exclusion of all other firearms (Ramirez: 651). One of the .380 caliber bullets recovered from the body of Mr. Jenkins was fired from the Lorcin, to the exclusion of all other firearms; and two were two were too deformed to permit conclusive analysis, but one was in sufficiently good shape to determine that the bullet was consistent with having been fired from the Lorcin (Ramirez: 650). Detective Ramirez determined that the bullets could have been fired only from the Lorcin or an identical model Lorcin (Ramirez: 650-51). Also, although Detective Ramirez could not determine with absolute scientific certainty that the .380 caliber bullets and shells had been fired from the Lorcin, he did determine to "a reasonable degree of scientific certainty" from all of the available evidence including the similarity of the markings that the bullets and shells had been fired from the recovered Lorcin (658, 60-61).

Joyce Haines, who grew up with defendant's father, testified on defendant's behalf that she had not seen her sister Joanne Adams on March 20, 1997 (Haines: 721-22). Ms. Haines conceded,

however, that no one had interviewed her about the March 20, 1997, shooting until August 6, 2001, nearly four and one-half years after the shooting occurred (Haines: 733, 737).

8. Defendant was convicted of one count of Murder in the Second Degree (N.Y. Penal Law § 125.25[1]) and two counts of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03[2]). Defendant was sentenced to concurrent terms of imprisonment of twenty-five years to life on the murder conviction and four and one-half to nine years on each of the weapon-possession convictions (Lott, J., at trial and sentence).

9. Defendant appealed from his judgment of conviction to the New York Supreme Court Appellate Division, Second Department (hereinafter, "Appellate Division"). James Neuman, Esq., represented defendant on his appeal. Mr. Neuman filed a thirty-six page brief on defendant's behalf, in which he raised four claims on defendant's behalf: (1) the verdict was against the weight of the evidence; (2) he was denied a fair trial by the improper admission of hearsay evidence; (3) the trial court improperly permitted the prosecutor to elicit at trial a prosecution witness' prior consistent statement; and (4) his sentence was excessive.

10. On October 12, 2004, the Appellate Division unanimously affirmed defendant's judgment of conviction and sentence. People v. Russell, 12 A.D.3d 463 (2d Dep't 2004). In its decision, the

Appellate Division held that the verdict was in accordance with the weight of the evidence. Id. The Appellate Division also held that defendant's sentence was not excessive. Id. The Appellate Division further held that defendant's remaining contentions were unpreserved for review. Id.

11. Defendant's appellate counsel applied for leave to appeal to the New York Court of Appeals from the Appellate Division's order affirming defendant's conviction.

12. On March 11, 2005, the Court of Appeals denied defendant leave to appeal from the Appellate Division's affirmance of his conviction. People v. Russell, 4 N.Y.3d 835 (2005) (Ciparick, J).

13. By pro se motion dated March 14, 2006, defendant moved in the Appellate Division a common law writ of error coram nobis on the ground of ineffective assistance of appellate counsel. Defendant claimed that his appellate counsel was ineffective because he failed to claim on appeal that defendant's trial counsel was ineffective for failing to preserve for appellate review one of the claims that appellate counsel raised on appeal, namely, the admission of hearsay at trial.

14. By decision and order dated, July 18, 2006, the Appellate Division, denied defendant's motion for a writ of error coram nobis. People v. Russell, 31 A.D.3d 671, 817 N.Y.S.2d 910 (2d Dep't 2006).

15. In his present petition for a writ of habeas corpus, defendant again claims, as he did in his state appeal, that: (1) the verdict was against the weight of the evidence; (2) he was denied a fair trial by the improper admission of hearsay evidence; (3) the trial court improperly permitted the prosecutor to elicit at trial a prosecution witness' prior consistent statement; and (4) his sentence was excessive.

For the reasons set forth in the accompanying memorandum of law, defendant's petition should be summarily denied.

I certify under penalty of perjury that, upon information and belief, the foregoing is true and correct.

Dated: Brooklyn, New York
November 17, 2006

______________________________
Solomon Neubort
Assistant District Attorney
Office of the Kings County District Attorney
350 Jay Street
Brooklyn, New York 11201
(718) 250-2514

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| YAKIM RUSSELL,<br><br>Petitioner,<br><br>-against-<br><br>HAROLD GRAHAM, SUPT.,<br><br>Respondent. | CV-06-5730 (JG)<br><br>MEMORANDUM OF LAW |

POINT I

THE CLAIM RAISED BY DEFENDANT -- A STATE PRISONER -- THAT THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE IS NOT COGNIZABLE ON HIS PETITION FOR FEDERAL HABEAS RELIEF. IN ANY EVENT, THE STATE COURT'S REJECTION OF THAT CLAIM WAS NOT CONTRARY TO, NOR AN UNREASONABLE APPLICATION OF, CONSTITUTIONAL LAW AS DETERMINED BY THE SUPREME COURT.

Defendant claims that the verdict was against the weight of the evidence is not cognizable on his petition for habeas relief. Under New York law, a claim that a verdict was against the weight of the evidence is a distinct claim from a claim that the trial evidence was legally insufficient to support a conviction. See N.Y. Crim. Proc. Law §§ 470.05(4)(b), 470.05(5). In New York, when a defendant claims that the evidence was legally insufficient to support the jury's verdict, the reviewing court must determine whether, when viewing the

evidence in the light most favorable to the prosecution, it can be said that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Bleakley, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761 (1987). By contrast, when a defendant claims that the verdict was unsupported by the weight of the evidence, the reviewing court assumes that there was sufficient evidence to permit a rational finder of fact to find that the essential elements of the crime were established beyond a reasonable doubt. Id. The role of the reviewing court in that case is to determine only whether the trier of fact adequately weighed "the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony." Id.

Federal habeas courts have no power to review the weight of the evidence supporting a state jury's verdict. See Young v. Kemp, 760 F.2d 1097, 1105 (11th Cir. 1985) ("A federal habeas corpus court has no power to grant habeas relief because it finds that the state conviction is against the 'weight' of the evidence"); Young v. Abrams, 698 F.2d 131, 135 (2d Cir. 1983); Ex parte Craig, 282 F. 138, 148 (2d Cir. 1922) ("a writ of habeas corpus cannot be used to review the weight of evidence"), aff'd, 263 U.S. 255 (1923). Indeed, the Supreme Court in Jackson v. Virginia, 443 U.S. 307, 318-319 (1979), held that the

relevant inquiry on habeas corpus review is whether, when "viewing the evidence in the light most favorable to the prosecution," it can be said that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Thus, claims relating to the weight of the evidence, which assumes that the verdict was supported by legally sufficient evidence, is not cognizable on habeas review. See Douglas v. Portuondo, 232 F. Supp. 2d 106, 115, 116 (S.D.N.Y. 2002); Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001); Rodriguez v. O'Keefe, 96 Civ. 2094, 1996 U.S. Dist. LEXIS 10808, 1996 WL 428164 at *4 (S.D.N.Y. July 31, 1996) ("A claim that the verdict was against the weight of the evidence is not cognizable on habeas review."), aff'd, 122 F.3d 1057 (2d Cir. 1997), cert. denied, 522 U.S. 1123 (1998); see also, e.g., Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (dismissing habeas claim; "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues"); Fagon v. Bara, 717 F. Supp. 976, 979 (E.D.N.Y. 1989) (habeas court not free to make credibility judgments or weigh conflicting evidence); Payne v. Jones, 638 F. Supp. 669, 672-73 (E.D.N.Y. 1986), aff'd, 812 F.2d 712 (2d Cir. 1987); accord, Young v. Kemp, 760 F.2d 1097, 1105 (11th Cir. 1985) ("A federal habeas court has no power to grant

habeas corpus relief because it finds that the state conviction is against the 'weight' of the evidence"), cert. denied, 476 U.S. 1123 (1986).

In this case, in his brief to the Appellate Division, defendant expressly noted that that the Appellate Division had the power to review whether the verdict was supported by legally sufficient evidence and whether the verdict was in accordance with the weight of the evidence. After noting that the Appellate Division had these two distinct review powers, defendant asked the Appellate Division to review only whether the verdict was in accordance with the weight of the evidence, but did not ask the court to review whether the verdict was supported by legally sufficient evidence. Accordingly, defendant's claim that the verdict was not in accordance with the weight of the evidence is not cognizable herein.

Furthermore, defendant's claim is not reviewable herein for another reason as well. Defendant did not fairly present his claim to the state courts because he did not allege in the state courts that his conviction was obtained in violation of his federal constitutional rights. In his brief to the Appellate Division, defendant raised his claim solely in terms of state law, namely, that the verdict did not conform to the weight of the evidence, not that the verdict was unsupported by legally sufficient evidence. Consequently, the Appellate Division had no

reason to consider whether the verdict was constitutionally defective. See Daye v. Attorney General, 696 F.2d at 194; see also Baldwin v. Reese, 124 S. Ct. 1347 (2004) (defendant failed to alert state court to federal nature of his "ineffective assistance of appellate counsel" claim, where petition to state court did not refer to provisions of Federal Constitution in respect to that claim and provided no citation of any case that might have alerted court to alleged federal nature of claim); Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution"); Anderson v. Harless, 459 U.S. 4 (1982) (per curiam) (defendant's claim in state court that instruction on element of crime was reversible error did not fairly present claim that instruction unconstitutionally shifted burden of proof); Petrucelli v. Coombe, 735 F.2d 684, 690 (2d Cir. 1984) (not every argument which remotely resembles a federal constitutional claim alerts the state court to the constitutional nature of the claim). Accordingly, defendant had not exhausted his claim in the state courts because defendant failed to alert the state courts to the alleged federal constitutional aspect underlying his claim.

Moreover, because defendant did not exhaust his state remedies with respect to his claim, but no longer has a state forum in which to raise the claim, his claim should be deemed exhausted, but denied on the ground that it is procedurally barred.[5] See Bossett v. Walker, 41 F.3d 825, 828-29 (2d Cir. 1994); Grey v. Hoke, 933 F.2d 117, 120-21 (2d Cir. 1992).

Defendant has not asserted any cause or prejudice that would excuse him from the effect of his procedural default. See Murray v. Carrier, 477 U.S. 478, 485 (1986). To establish cause for a procedural default, a state prisoner ordinarily must show "that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rules." Id. at 488. Here, there was nothing to prevent defendant from raising the claim on direct appeal to the Appellate Division.

Moreover, the Appellate Division's rejection of defendant's claim constituted an adjudication of the claim on the merits. Therefore, the Appellate Division's rulings are entitled to deference under the Antiterrorism and Effective Death Penalty Act of 1996.

---

[5] Because defendant's direct appeal to the Appellate Division has already been decided, he can no longer raise the issue in the Appellate Division. See N.Y. C.P.L. §§ 450.10, 450.20. Nor can he raise the claim in the New York Court of Appeals. See N.Y. C.P.L. §§ 450.70, 450.90. Finally, he cannot raise the claim in a motion to vacate judgment because the basis for his claim is sufficiently apparent from the trial record for him to have raised the claim on direct appeal. See C.P.L. § 440.10(2)(c).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus cannot be granted unless the adjudication of the claim in the state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Bell v. Cone, 535 U.S. 685, 693-93 (2002).

The deferential standard of review spelled out in 28 U.S.C. § 2254(d) applies to a claim raised by a habeas corpus petitioner in state custody whenever the state court's adjudication of the claim was "on the merits." 28 U.S.C. § 2254(d); Eze v. Senkowski, 321 F.3d 110, 121-22 (2d Cir. 2003); Sellan v. Kuhlman, 261 F.3d 303, 309-10 (2d Cir. 2001).

A state court has adjudicated a constitutional claim on the merits when the state court "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." Sellan, 261 F.3d at 312; see Eze, 321 F.3d at 121-22. The state court is not required to refer explicitly "either to the federal claim or to relevant federal case law" to have considered a federal claim on the merits. Sellan, 261 F.3d at 312. In this case, the Appellate Division adjudicated the claim on its merits by holding

that "the verdict of guilt was not against the weight of the evidence." People v. Russell, 12 A.D.3d at 464, 783 N.Y.S.2d at 824. Accordingly, the decision of the Appellate Division should be reviewed with deference to the Appellate Division.

The evidence of defendant's guilt in this case included the compelling testimony of Joanne Adams. Ms. Adams testified that she observed defendant, Mark Crowder, and Jatike Jackson all armed with guns standing outside the hallway where Omar Jenkins and Fred Benbury were shot moments later. Ms. Adams also testified that defendant warned her to leave the area and that she pretended to leave. Ms. Adams heard a door slam and then heard Omar Jenkins begin conversing in the hallway, immediately after which she heard defendant tell his accomplices "Let's do this." Ms. Adams then observed defendant and his friends enter the hallway and heard gunshots erupt immediately thereafter.

The evidence also included the testimony of Ms. Reese who testified that the victims were unarmed when they left her apartment moments before the shooting, thus establishing that defendant and his gang ambushed and shot unarmed victims.

Ms. Adams' testimony, implicating defendant in the shooting, was corroborated by Jermaine Brown who testified that defendant bragged to him the next day that he shot Omar Jenkins. Ms. Adam's testimony was also corroborated by Jermaine Brown's testimony that

Fred Benbury exclaimed to him immediately after the shooting that Mark Crowder shot him.

Ms. Adams' and Mr. Brown's testimony implicating defendant were corroborated by the fact that the police recovered the guns used in the shooting from defendant's girlfriend's apartment shortly after the shooting. Accordingly, the jury's verdict was supported by the weight of the evidence.

Additionally, Ms. Adams' testimony that she observed three men armed with guns -- defendant, Mark Crowder, and Jatike Jackson -- was also corroborated by the fact that the police recovered ballistics from three guns in the hallway and recovered three guns from defendant's girlfriend's apartment. The fact that Ms. Adams testified that she observed three people armed with guns was especially significant in light of the fact that defendant's girlfriend testified that she did not see how many guns the police removed from her apartment (Adams: 203-04).

Defendant, nevertheless, claims that the verdict was against the weight of the evidence because Joanne Adams was a drug addict convicted of prostitution and drug-related crimes and because Jermaine Brown was a convicted felon who testified at trial pursuant to a cooperation agreement. The claim is meritless.

So long as a witness' testimony is logical and consistent with other evidence, his or her addiction to drugs will not render the testimony incredible as a matter of law or render the verdict

against the weight of the evidence. See Manning v. Walker, 99-CV-5747, 2001 U.S. Dist. LEXIS 109, *15-18 (E.D.N.Y. 2001) (Gleeson, J.); People v. Terell, 298 A.D.2d 241 (1st Dep't 2002); People v. Buie, 289 A.D.2d 140 (1st Dep't 2001); People v. Peterson, 232 A.D.2d 192 (1st Dep't 1996); People v. Roman, 217 A.D.2d 431 (1st Dep't 1995); People v. Wrigglesworth, 204 A.D.2d 758 (3d Dep't 1994); People v. Walker, 185 A.D.2d 867 (2nd Dep't 1992); People v. Mustafa, 126 A.D.2d 674 (2nd Dep't 1987).

A witness's criminal record is also a credibility issue for the jury to consider. See Manning v. Walker, 99-CV-5747, 2001 U.S. Dist. LEXIS 109 at *15-18. Here, the jurors were fully apprised of Ms. Adams' and Mr. Brown's criminal history, and, thus, their determination should be afforded great deference upon review. See People v. Smith, 302 A.D.2d 615 (2d Dep't 2003) (criminal history of eyewitness did not render verdict against weight of the evidence); People v. Harris, 276 A.D.2d 562 (2d Dep't 2000) (fact that witness had unsavory past, criminal background, and testified pursuant to cooperation agreement did not render witness incredible or verdict against weight of the evidence); People v. Toro, 272 A.D.2d 351 (2d Dep't 2000) (witness' criminal record and drug addiction did not render witness inherently incredible or render verdict against weight of the evidence); People v. McDaniel, 233 A.D.2d 343 (2d Dep't 1996) (fact that witness testified pursuant to cooperation agreement did

not render witness incredible as matter of law); People v. Antwon, 223 A.D.2d 599 (2d Dep't 1996) (fact that witnesses were involved in drug sales and testified pursuant to cooperation agreements did not render their testimony incredible as matter of law or jury's verdict against weight of the evidence); People v. Butler, 221 A.D.2d 458 (2d Dep't 1995). Indeed, it has long been recognized that "if the testimony of bad men were absolutely rejected, many murderers would escape the punishment they deserve." People v. Becker, 215 N.Y.2d 123, 140 (1915); see People v. Robinson, 89 N.Y.2d 648 (credibility is for trier of fact to determine); People v. Santiago, 228 A.D.2d 706, 707 (2d Dep't 1996) (credibility of witness with criminal record and drug history is primarily a jury question).

Moreover, as explained above, Ms. Adams' and Mr. Brown's testimony implicating defendant were corroborated by the fact that the police recovered the guns used in the shooting from defendant's girlfriend's apartment shortly after the shooting.

In sum, defendant's claim is not cognizable on habeas review, procedurally barred, and meritless. Accordingly, the claim should be summarily denied.

POINT II

THE STATE COURT'S REJECTION OF DEFENDANT'S CLAIM THAT HE WAS DENIED A FAIR TRIAL BY THE IMPROPER ADMISSION OF HEARSAY EVIDENCE IS PROCEDURALLY BARRED BECAUSE THE STATE COURT REJECTED THE CLAIM ON AN INDEPENDENT AND ADEQUATE STATE GROUND. IN ANY EVENT, THE CLAIM IS MERITLESS.

Defendant's claim that he was denied a fair trial by the improper admission of hearsay evidence is procedurally barred on habeas review because the Appellate Division denied the claims on an independent and adequate state ground. A federal court, when reviewing a habeas petition from a state prisoner, cannot consider the merits of a federal constitutional claim when the state court refused to review the merits of the claim on an adequate and independent state ground. Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Coleman v. Thompson, 501 U.S. 722, 727-30 (1991); Wainwright v. Sykes, 433 U.S. 72, 81-91 (1977).

Defendant raised this claim in his appeal to the Appellate Division, and the Appellate Division rejected the claim on the ground that defendant failed to preserve his claim for review. People v. Russel, 12 A.D.3d 463, 783 N.Y.S.2d 823 (2d Dep't 2004) (after rejecting defendant's weight of the evidence claim and his sentencing claim, Appellate Division held that defendant's remaining claims were unpreserved).

New York State's preservation rule is an adequate and independent state ground for decision. See Velasquez v. Leonardo,

898 F.2d 7, 9 (2d Cir. 1990); Washington v. LeFevre, 637 F. Supp. 1175, 1176-77 (E.D.N.Y. 1986); see generally Wainwright v. Sykes, 433 U.S. at 85-90.

The Appellate Division's decision that defendant failed to preserve the claim for appellate review was proper under New York law. Defendant claims that he was denied a fair trial by the admission of Detective McNally's testimony that defendant's name was mentioned during the detective's initial investigation of the shooting. When that testimony was elicited, defendant generally objected, without asserting any specific ground for the objection, and the court delivered a curative instruction from which defendant registered no further objection. Specifically, the court instructed the jury that that evidence was not being offered to establish the truth of the matter asserted but only as background information to explain the actions of the police leading to the arrest of defendant (171). Defendant did not object to the court's limiting instruction (171). Accordingly, the claim was unpreserved for appellate review under New York law. See N.Y. Crim. Proc. Law § 470.05(2); People v. Heide, 84 N.Y.2d 943 (1994); People v. Clarke, 81 N.Y.2d 777 (1993) (where defendant registered only general objection at trial, defendant's contention on appeal that the testimony constituted hearsay and improperly bolstered another prosecution witness' testimony was unpreserved); People v. Williams, 46 N.Y.2d 1070 (1979); People v.

Jimenez, 246 A.D.2d 333 (1st Dep't 1998) ("Defendant's challenge to alleged hearsay in the form of testimony that defendant was arrested after the police had spoken to three non-testifying witnesses to the crime has not been preserved for appellate review, since counsel raised only general objections to such testimony and did not request any further relief after the court provided limiting instructions, and we decline to review it in the interest of justice") (citations omitted).

Indeed, in People v. Fleming, 70 N.Y.2d 947 (1988), a case with analogous facts, the New York Court of Appeals held that the claim was unpreserved. Specifically, the Court held:

> Defendant's sole claim of error -- that the trial court violated his right of confrontation by permitting the arresting officer to testify that he arrested defendant after a conversation with an individual who did not testify -- has not been preserved for our review. Although defense counsel sought a prospective ruling on this point, the court declined to make an anticipatory ruling. When the arresting officer later testified at trial, counsel entered objections as "objection" or "leading," but failed to advise the trial court that the present claimed error was the basis for any of his objections. The word "objection" alone was insufficient to preserve the issue for our review.

Moreover, the claim is meritless. A state court's evidentiary rulings do not generally present constitutional issues cognizable in a habeas corpus petition. See Crane v. Kentucky, 476 U.S. 683, 689 (1986) ("[w]e . . . acknowledge our

traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts"); see also Jenkins v. Bara, 663 F. Supp. 891, 899 (E.D.N.Y. 1987). And, "not 'every error of state law can be transmogrified by artful argumentation into a constitutional violation.'" Ponnapula v. Spitzer, 297 F.3d 172 (2d Cir. 2002), quoting Sanna v. Dipaolo, 265 F.3d 1, 12 (1st Cir. 2001).

With respect to erroneous admissions of evidence, it is well settled that state evidentiary rulings generally do not implicate the federal constitution. See Ohio v. Roberts, 448 U.S. 56, 66 (1979); Mattox v. United States, 156 U.S. 237, 243-44 (1894); United States v. Nick, 604 F.2d 1199, 1202-03 (9th Cir. 1979). Accordingly, "[i]n order to prevail on a claim that an evidentiary error deprived [a] defendant of due process . . . he must show that the error was so pervasive as to have denied him a fundamentally fair trial." Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985); see also Estelle v. McGuire, 502 U.S. 62, 72 (1991); Aponte v. Scully, 740 F. Supp. 153, 158 (E.D.N.Y. 1990) (petitioner seeking habeas corpus relief based on a claim of erroneous admission of evidence "bears a heavy burden; mere evidentiary errors generally do not rise to constitutional magnitude"). Thus, claims relating to the admission at trial of a defendant's prior convictions or bad acts is redressable in a federal habeas corpus petition only if the particular errors

were so egregious and prejudicial as to constitute fundamental unfairness. Underwood v. Kelly, 692 F. Supp. 146, 150-51 (E.D.N.Y. 1988), aff'd mem., 875 F.2d 857 (2d Cir.), cert. denied, 493 U.S. 837 (1989); Warren v. Miller, 78 F. Supp. 2d 120, 135 (E.D.N.Y. 2000).

In this case, the testimony, as limited by the court's limiting instructions, was properly admitted, under both federal and New York law, as background material to assist the jury in understanding the events leading up to defendant's arrest. See United States v. Pedroza, 750 F.2d 187, 200 (2d Cir. 1984) ("When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters with the understanding or intent with which certain acts were performed."); People v. Jimenez, 246 A.D.2d at 333-34. Indeed, the authorization slip that Christine Adams signed, permitting the police to search the apartment -- which was entered into evidence at trial -- explicitly stated that Ms. Adams granted the police permission to search the apartment for defendant and for the weapons used in the shooting. Thus, without any explanation that defendant had been implicated in the shooting, the jury would have been left to speculate about why the police searched Christine Adams' apartment. Accordingly, the evidence was properly admitted

as background material about how the police investigation led to the recovery of the weapons and defendant's arrest.

Furthermore, the fact that defendant became a suspect during the initial investigation does not compel the conclusion that other witnesses implicated defendant in the shooting. The jury could have reasonably concluded that defendant was not implicated by other witnesses to the event. Instead, the jury could have reasonably concluded that Joanne Adams or Jermaine Brown told their friends or acquaintances about what happened and that the police learned about the shooting from those non-witnesses or even from others who subsequently heard rumors of defendant's involvement. Accordingly, the jury had no reason to conclude that defendant was implicated by other witnesses to the shooting.

Defendant's claim that he was denied a fair trial because Detective McNally testified that he interviewed Frank Benbury is also procedurally barred because the Appellate Division rejected the claim on an independent and adequate state ground, namely, that the claim was unpreserved for appellate review. The Appellate Division's decision that the claim was unpreserved was proper. Defendant did not object to the introduction of that testimony. See N.Y. Crim. Proc. Law § 470.05(2). Indeed, when the People first began questioning Detective McNally about his investigation into the shooting, the People explained to defense counsel, at a sidebar conference, that the detective would testify

only about the fact that he interviewed witnesses but not about the content of the interviews (428). Defense counsel replied, "Okay;" the court added that "In the Court's view that's appropriate"; and defense counsel registered no objection to the court's stated opinion (428).

Furthermore, defendant may have decided not to object to the introduction of that testimony because the jury was also informed that Mr. Benbury was incarcerated (430). Defense counsel used those facts on summation to argue that Mr. Benbury was available to testify for the prosecution but chose not to do so (770-75). Accordingly, the Appellate Division properly held that defendant should not be heard to complain on appeal about the introduction of that evidence when he did not complain about it at trial, presumably because he wanted to use that evidence to his advantage on summation. Thus, defendant's claim is procedurally barred on habeas review, because it was rejected by the state court on an independent and adequate state ground.

Moreover, the claim is meritless. The court instructed the jury that the entire line of questioning regarding the police investigation was not being introduced to establish the truth of the statements made by people who cooperated with the police but solely to provide background material to assist the jury in understanding the events leading up to defendant's arrest (429). The fact that the police interviewed Fred Benbury was relevant

background information, because, without that information, the jury would have been left to speculate that the police conducted such a poor investigation into the incident that they never even interviewed a victim of the shooting.

Additionally, contrary to defendant's assertion, the fact that Detective McNally interviewed Fred Benbury was not elicited in a manner that inherently suggested that Mr. Benbury implicated defendant in the shooting. Rather, the detective's interview with Mr. Benbury was elicited only as part of a list of things that the detective did during his investigation of the shooting (430). Indeed, the evidence adduced at trial was that defendant was not brought to the precinct for nearly three months after that interview was conducted and was not arrested for more than two years after that interview was conducted (430-32). Accordingly, the jury had no reason to infer from that evidence that Fred Benbury implicated defendant in that interview.

Defendant's claim that the prosecutor improperly elicited from Detective Maher that Kinte McKenzie viewed defendant in a lineup is also procedurally barred because the Appellate Division rejected the claim on an independent and adequate state ground, namely, that the claim was unpreserved for appellate review. Defendant did not object at trial when the prosecutor elicited that Kinte McKenzie viewed a lineup (434). See N.Y. Crim. Proc. Law § 470.05(2). Additionally, the prosecutor did not elicit the

results of the lineup procedure (434). Indeed, defendant highlighted in his summation the fact that there was no evidence that McKenzie identified defendant when he viewed the lineup (771).

Moreover, as explained above, the court issued a limiting instruction to the jury not to consider Detective Maher's testimony about his investigation as evidence of defendant's guilt but rather only as background material about the events leading to defendant's arrest (824).

In any event, any error in the admission of the challenged evidence was harmless.

As a preliminary matter, other then the fact that Kinte McKenzie viewed a lineup in which defendant was a participant, no other evidence was introduced at trial about Kinte McKenzie. In their opening statement, the People stated that Kinte McKenzie was with Omar Jenkins on the night of the shooting (98-99) but did not state that McKenzie was with Jenkins during the shooting or what role he played in the incident, and no evidence was introduced at trial in that regard. Thus, contrary to defendant's Statement of Facts in his appellate brief (Defendant's Appellate Brief at 5-7), no evidence was introduced at trial to establish that it was Kinte McKenzie who told Ms. Reese that "They shot my friend, they shot my man" (216-17). Therefore, the jury was not presented with any evidence that Kinte McKenzie witnessed the shooting. Thus, the

jury could -- just as reasonably -- have concluded that it was possible that Kinte McKenzie did not witness the shooting at all. Instead, the jury could have reasonably concluded that the police asked McKenzie to view the lineup only because he observed defendant holding the guns when defendant entered his girlfriend's apartment -- which would have supported only a misdemeanor gun possession charge, but not the murder or second-degree gun possession charges with which defendant was charged. Indeed, defendant suggested in his appellate brief (Defendant's Appellate Brief at 19-20), that, at most, the evidence supports a finding that defendant hid the guns for his friends after the shooting but not that he participated in the shooting. Accordingly, the jury had no reason to conclude that Kinte McKenzie implicated defendant in anything that supported the charges with which defendant was actually charged.

Moreover, in light of the overwhelming evidence of defendant's guilt, any error in the admission of that evidence was further rendered harmless. The overwhelming evidence included Ms. Adams' eyewitness testimony that defendant and two others were involved in the shooting, Mr. Brown's testimony that defendant confessed to the shooting, and the corroborative evidence that the police found the three guns used in the shooting in defendant's girlfriend's apartment shortly after the shooting. In addition, Mr. Brown testified that, prior to trial, defendant told him that

he became a suspect only because Mark Crowder implicated him in the shooting in his statements to the police (312-16). Accordingly, the jury properly learned that Mark Crowder had also implicated defendant in the homicide.

In sum, defendant's claim is procedurally barred and meritless. Accordingly, the claim should be summarily denied.

POINT III

DEFENDANT'S CLAIM THAT A PROSECUTION WITNESS' PRIOR CONSISTENT STATEMENT WAS IMPROPERLY ELICITED AT TRIAL IS PROCEDURALLY BARRED BECAUSE THE STATE COURT REJECTED THE CLAIM ON AN INDEPENDENT AND ADEQUATE STATE GROUND. IN ANY EVENT, THE CLAIM IS MERITLESS.

Defendant's claim that he was denied a fair trial by the improper admission of hearsay evidence is procedurally barred on habeas review because the Appellate Division denied the claims on an independent and adequate state ground. A federal court, when reviewing a habeas petition from a state prisoner, cannot consider the merits of a federal constitutional claim when the state court refused to review the merits of the claim on an adequate and independent state ground. Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Coleman v. Thompson, 501 U.S. 722, 727-30 (1991); Wainwright v. Sykes, 433 U.S. 72, 81-91 (1977).

Defendant raised this claim in his appeal to the Appellate Division, and the Appellate Division rejected the claim on the ground that defendant failed to preserve his claim for review. People v. Russel, 12 A.D.3d 463, 783 N.Y.S.2d 823 (2d Dep't 2004) (after rejecting defendant's weight of the evidence claim and his sentencing claim, Appellate Division held that defendant's remaining claims were unpreserved).

New York State's preservation rule is an adequate and independent state ground for decision. See Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); Washington v. LeFevre, 637 F. Supp.

1175, 1176-77 (E.D.N.Y. 1986); see generally Wainwright v. Sykes, 433 U.S. at 85-90.

The Appellate Division's decision that defendant failed to preserve the claim for appellate review was proper under New York law. At trial, when the prosecutor elicited Ms. Adams' statement to the police, defense counsel objected on the ground that the statement constituted a prior consistent statement. In support of that claim, however, defense counsel at trial raised the opposite argument of the one he raised on appeal. At trial, defense counsel explained to the court that a prior consistent statement is admissible only to rebut a claim of recent fabrication, which means that the "[t]he motive to fabricate has to have existed at the time of the prior inconsistency, of the prior consistency" (566-67). In other words, defense counsel argued that a prior consistent statement is admissible only when the witness' motive to lie precedes the making of the prior consistent statement. In stark contrast and directly converse to his trial argument, on appeal, defendant argued that Ms. Adams' statement to the police was inadmissible because her motive to lie preceded her statement to the police. Thus, at trial defendant argued that the evidence was inadmissible because the motive to lie preceded the making of the prior statement, whereas on appeal defendant argued that the evidence was inadmissible because the motive to lie did not precede the making of the prior statement. Accordingly, because

defendant asserted the opposite argument on appeal from the one he asserted at trial, the claim was unpreserved for appellate review. See N.Y. Crim. Proc. Law § 470.05(2).

Moreover, the receipt of the witness's prior consistent statement did not violate defendant's constitutional rights. In Crawford v. Washington, the Supreme Court reiterated that when a declarant appears for cross-examination at trial, "the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." 541 U.S. 36, 124 S. Ct. 1354, 1369, n.9 (2004). "Courts have consistently held that the admission of a prior consistent statement when the declarant is available for cross examination at trial . . . is not a question that rises to a constitutional level." United States ex. rel. Gonzalez v. DeTella, 918 F. Supp. 1214, 1222 (N.D. Ill. 1996), aff'd 127 F. 3d 619 (7th Cir. 1997), cert. denied, 523 U.S. 1032 (1998). In this case, the prior consistent statement was elicited from a witness who was subsequently cross-examined by defendant.

Moreover, even under New York law, the trial court properly permitted the People to introduce the witness' prior consistent statement, because admission of that evidence was necessary to rebut an implied claim of recent fabrication. At trial Joanne Adams testified on direct examination that she observed defendant leaving, but not entering, her daughter's apartment. On cross-examination, defense counsel elicited from Ms. Adams that she

testified before the grand jury that she also observed defendant entering that apartment holding guns. On redirect examination, the prosecutor elicited from Ms. Adams that she reported to the police only that she observed defendant leaving the apartment and that she did not mention seeing him enter the apartment holding guns.

Defendant claims that Ms. Adams' statement to the police should have been precluded on the ground that a prior consistent statement is admissible only to refute a claim of recent fabrication and that defendant, in this case, had asserted no such claim of recent fabrication. Defendant is wrong. The implication of defendant's cross-examination of Joanne Adams was that she recently fabricated her testimony. See People v. McDaniel, 81 N.Y.2d 10, 18-19 (1993) (holding that People properly elicited prior consistent statement even where claim of recent fabrication was only implied); People v. Boyd, 58 N.Y.2d 1016, 1018 (1983) (same); People v. Terrell, 298 A.D.2d 241 (1st Dep't 2002) (same).

In his opening statement at trial, defendant argued that the only reason that Joanne Adams told the police that she witnessed the shooting was because she hoped to make a deal in which she would receive leniency on her prostitution charge in exchange for her testimony at trial. At trial, however, the People elicited that, in fact, no promises were made to Ms. Adams in exchange for her testimony. Thus, the jurors could have reasonably suspected

that -- because Ms. Adams' hopes for a deal were dashed -- she might not have felt compelled to be truthful in her trial testimony, or worse that she decided to be vindictive and lie. Therefore, when the jurors were presented with an inconsistency between Ms. Adams' grand jury testimony and her trial testimony, the jury could have reasonably concluded that Ms. Adams lied in her trial testimony rather than in her grand jury testimony. The jury could have considered that Ms. Adams had an incentive to tell the truth to the grand jury because at that point she could have still clung to the hope that she could still make a deal for her trial testimony -- which would be valid only if she were truthful. Cf. United States v. Cosentino, 844 F.2d 30, 32 (2nd Cir. 1988) (elicitation of contents of cooperation agreements is "inevitably" of great interest to the prosecution because such agreements "tend to support witnesses' credibility by setting out promises to testify truthfully as well as penalties for failure to do so"). At trial, however, Ms. Adams no longer had any hope of entering a cooperation agreement and thus the jury, when faced with the inconsistency in the testimonies, could have reasonably concluded that Ms. Adams vindictively lied at trial. Accordingly, by eliciting the inconsistency between Ms. Adams' grand jury and trial testimonies, defendant was in effect asking the jury to conclude that Ms. Adams' trial testimony was a recent fabrication. The People were therefore entitled, on redirect examination, to

introduce Ms. Adams' prior consistent statement to the police, which predated her motive to lie out of vindictiveness or carelessness.

In any event, any error in the admission of the prior consistent statement was clearly harmless.

First, Ms. Adams' testimony before the grand jury was more inculpatory than was her trial testimony. In her trial testimony, Ms. Adams' testified only that she observed defendant exiting the apartment, whereas, in her grand jury testimony, she testified that she also observed defendant enter the apartment holding guns. Accordingly, defendant was not prejudiced by the prosecutor's attempt to persuade the jury to reject the highly inculpatory grand jury testimony and instead credit the less inculpatory trial testimony.

Second, even without Ms. Adams' testimony that she observed defendant exit the apartment after the shooting, the evidence that defendant was involved in the shooting was overwhelming. Ms. Adams saw defendant brandishing a gun and heard him tell the others "let's do this" immediately before the victims were shot a few feet away. In addition, defendant confessed to Mr. Brown that he killed Omar Jenkins. Moreover, even without Ms. Adams' testimony that she observed defendant exiting his girlfriend's apartment, the fact remains that, shortly after the shooting, the police recovered the guns used in the shooting from the apartment

of defendant's girlfriend. Furthermore, defendant's girlfriend testified that defendant had access to her apartment and that Mark Crowder and Jatike Jackson did not (206), thus further implicating defendant. Accordingly, even without Ms. Adams' testimony that she observed defendant exiting the apartment, the evidence linking defendant to the shooting was overwhelming.

Third, the admission of Ms. Adams' statement to the police also did not adversely affect defendant's attempt to impeach Ms. Adams' general credibility as a witness. Defendant apparently sought to demonstrate, by eliciting Ms. Adams' grand testimony, that Ms. Adams was a liar who gave conflicting testimony and that therefore her entire testimony should be discredited. However, the fact that Ms. Adams' grand jury testimony also conflicted with her statement to the police in no way could have undermined defense counsel's effort in that regard. Either way, her general credibility as a witness was undermined by the fact that she gave conflicting testimony. Indeed, Ms. Adams explicitly conceded that she lied in her grand jury testimony (572). Thus, the fact that Ms. Adams' grand jury testimony also conflicted with her statement to the police could not have made her any more of a credible as a witness. Accordingly, defendant was not prejudiced by the fact that the jury learned that Ms. Adams' grand jury testimony conflicted with her statement to the police as well as with her trial testimony.

In sum, defendant's claim that the People improperly elicited Ms. Adams' statement to the police is procedurally barred and meritless. In any, event any error in eliciting that statement was harmless.

POINT IV

DEFENDANT'S CLAIM THAT HIS SENTENCE WAS HARSH AND EXCESSIVE IS NOT COGNIZABLE ON HABEAS REVIEW.

Excessive sentence claims of state prisoners are generally not cognizable on federal habeas review so long as the term of the sentence falls within the state's statutory range. See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992); Foreman v. Garvin, 99-CV-9078, 2000 U.S. Dist. LEXIS 8219, *42 (S.D.N.Y. June 29, 2000); Alvarez v. Scully, 833 F. Supp. 1000, 1009 (S.D.N.Y. 1993); see also Dorszynski v. United States, 418 U.S. 424, 431 (1974); Townsend v. Burke, 334 U.S. 736, 741 (1948). Indeed, the Second Circuit has repeatedly stated that "we should not substitute our judgment for that of the sentencing court, but when applying the Eighth Amendment to decide only whether the sentence is within constitutional limits; a review that rarely requires extended analysis." United States v. Gaggi, 811 F.2d 47, 63 (2d Cir. 1987), cert. denied, 482 U.S. 929 (1987); United States v. Salerno, 868 F.2d at 543; United States v. Bonnet, 769 F.2d 68, 71 (2d Cir. 1985); see also Salcedo v. Artuz, 107 F. Supp. 2d 45, 415 (S.D.N.Y. 2000).

Thus, although proportionality in criminal sentences is required, see Solem v. Helm, 463 U.S. 277, 290 (1983), the Supreme Court has cautioned that successful challenges to the proportionality of particular sentences should be "exceedingly

rare." Hutto v. Davis, 454 U.S. 370, 374, reh'g denied, 455 U.S. 1038 (1982) (quoting Rummel v. Estelle, 445 U.S. 263, 272 [1980]); see also United States v. Torres, 901 F.2d 205, 248 (2d Cir. 1990); Jackson v. Moscicki, 99-CV-2427 2000 U.S. Dist. LEXIS 5577, *36-37 (S.D.N.Y. April 25, 2000).

Indeed, even when reviewing sentences on direct appeal, the Second Circuit "ordinarily" declines to "interfere with" the trial court's exercise of discretion "absent a claim that the sentence was illegally imposed, in excess of the applicable statutory maximum, based upon materially incorrect information, or the result of a constitutionally defective sentencing procedure." Gaggi, 811 F.2d at 62.

In this case, defendant does not allege that the sentence was illegal under state law. Rather, defendant alleges only that the sentence was harsh and excessive. Accordingly, the claim should not be reviewed herein.

Moreover, defendant's aggregate sentence of twenty-five years to life fro his conviction of murder and illegal weapon possession was appropriate. The sentence was warranted by the facts of this case, by defendant's criminal history, and by defendant's apparent lack of remorse for his actions. This case concerns a particularly vicious homicide, in which defendant and his gang ambushed the victims and killed Omar Jenkins in a hail of bullets. The next day, defendant boasted about killing Omar Jenkins, and

the presentence report prepared by the state's Department of Probation indicated that defendant had no regard for human life (S. 5). Additionally, despite his young age, defendant already had multiple contacts with the criminal justice system, including a conviction and a youthful offender adjudication for criminal possession of a weapon. Moreover, defendant refused to accept responsibility for his actions or display any remorse at sentencing for his actions.

## CONCLUSION

FOR THE REASONS STATED ABOVE, DEFENDANT'S PETITION SHOULD BE SUMMARILY DENIED.

Respectfully submitted,

CHARLES J. HYNES
District Attorney
Kings County

LEONARD JOBLOVE
SOLOMON NEUBORT
Assistant District Attorneys
of Counsel

Certificate of Service

I hereby certify that on November 17, 2006, I caused the foregoing document to be served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the follow party:

Yakim Russell
01-A-6629
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13021

______________________________

Solomon Neubort
Assistant District Attorney
Office of the Kings County District Attorney
350 Jay Street
Brooklyn, New York 11201
(718) 250-2514