UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION ONLY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

YAKIM RUSSELL,

Petitioner,

v.

HAROLD GRAHAM,

Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM AND ORDER
06 CV 5730 (JG)

A P P E A R A N C E S:

YAKIM RUSSELL
Reg. # 01A6629
Auburn Correctional Facility
135 State Street
PO Box 618
Auburn, NY 13024
Petitioner *Pro Se*

CHARLES J. HYNES
Kings County District Attorney
350 Jay Street
Brooklyn, New York 11201
By: SOLOMON NEUBORT
Assistant District Attorney
Attorneys for Respondent

JOHN GLEESON, United States District Judge:

Yakim Russell petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his 2001 conviction in Kings County, following a jury trial, of murder in the second degree and two counts of criminal possession of a weapon in the second degree. For the reasons set forth below, the petition is denied.

## BACKGROUND

A. The Offense

The evidence at trial established that Russell, along with co-defendant Mark Crowder and Jatike Jackson, who died prior to trial, engaged in a shooting on March 20, 1997 that resulted in the death of Omar Jenkins ("O-Dog") and the injury of Frederick Benbury. The shooting took place on the fourth floor of an apartment building at 405 Williams Avenue in Brooklyn.

The victims and two other men had just exited the fourth floor apartment of Monique Reese, and as they stepped into the stairwell, three armed men opened fire. When the shooting began, Lamont Reese (Monique's brother) and another man were able to make their way back to the apartment unharmed. Benbury was shot in the waist and ran towards an exit at the opposite side of the fourth floor and out of the building. He was later treated for the bullet wound at Brookdale Hospital. Jenkins was killed by the spray of gunfire, having sustained 14 gunshot wounds.

When officers arrived on the scene, they found one .38 caliber bullet, one .25 caliber bullet, eight or nine .25 caliber shell casings, and six .380 caliber shell casings.

After canvassing the building for witnesses, Detective Michael McNally discovered that Christine Adams, a resident of apartment 5-E in the building, was dating Russell -- the man suggested by some residents to have been a perpetrator -- and that Russell lived next to her in apartment 5-D. McNally received written consent from Adams to search apartment 5-E, where he recovered three guns from under a mattress in a baby crib. The guns recovered were a .38 caliber revolver, a .25 caliber automatic with one live round in it, and a .380 caliber

semiautomatic. A ballistics expert later determined that (1) the .38 caliber bullets recovered from the scene and from the body of Jenkins had been shot by the .38 revolver recovered from Adams's apartment; (2) the .25 caliber cartridges found at the scene and the .25 caliber bullets taken from the body of Jenkins were fired from the .25 caliber weapon found in Adams's apartment; (3) one of the .380 bullets taken from Jenkins's body was fired from the .380 weapon recovered from Adams's apartment.

No witnesses came forward, however, and charges were not filed immediately following the shooting. More than two years later, two witnesses came forward with information implicating Russell, Crowder and Jackson. The first, Joanne Adams, told the police she was in the building that evening visiting her sister and her daughter (the above-mentioned Christine) on the fifth floor. She reported that she and a friend, both crack addicts, were heading downstairs to use crack. As they approached the fourth floor stairwell, they saw Russell, Crowder, and Jackson standing at the fourth floor with guns, peering through the glass window in the door to the hallway. Russell yelled at the women to go back up and use the other staircase. They ran up the stairs, but while her friend went into the fifth floor hallway, Joanne Adams lingered on the stairwell, and snuck halfway back down so that she could watch the men.

After hearing a door close on the fourth floor, Adams heard Russell say, "Let's do this," and saw the three open the door to the fourth floor hallway, after which shots were fired. Adams then ran up to the fifth floor, down the hallway, and down the other staircase to the third floor. She told the police that she then remembered that her daughter was on the fifth floor, so she went back up. Back on the fifth floor, she saw Russell exit apartment 5-E.

Adams told police that she had attempted to report the above information shortly after the shooting, but had been ignored. She came to police again on October 15, 1999 after an arrest for prostitution, and the police took her statement. She was not promised any leniency on her prostitution charge in exchange for giving the statement.

The second witness to come forward was Jermaine Brown. Brown told the police he had left a friend's apartment on the fifth floor of the building and was descending the stairwell opposite the one where the shooting took place. When he stopped to urinate in the stairwell halfway between the fifth and fourth floors, he heard gunshots from nearby. Brown then fled from the building to a nearby street corner, and soon he saw victim Fred Benbury run from the building shouting "Killer shot me," repeatedly. "Killer" was Crowder's nickname.

The next afternoon, Brown was at a nearby park with Russell and Crowder. Russell asked Crowder, "Did you see how I made the movie, how I shot O-Dog, did you see how I made the movie?" Crowder smirked and nodded twice in the affirmative. Brown later testified that "making a movie" is a slang term for shooting or stabbing someone.

Brown also testified that in early March, 1997, Russell had smashed a bottle over Jenkins's head at a club.

Brown did not report the above information until after he was convicted of robbery in the first and second degrees. He was promised that the prosecutor would recommend a reduced sentence if he testified truthfully against Russell and Crowder at trial.

B. The Procedural History

1. *The Trial Court Proceedings*

At trial, the state's primary witnesses were Joanne Adams, Jermaine Brown, and the ballistics experts. Defense counsel attacked the credibility of both Adams and Brown by highlighting their criminal backgrounds and by arguing that they had manufactured their stories in the hopes of receiving leniency in their pending criminal cases. Defense counsel also pointed out that no other witnesses had come forward and that no lacerations were discovered on Jenkins's head despite the testimony that Russell had smashed a champagne bottle over it in the recent past. In addition, Joyce Haines, the sister of Joanne Adams, testified on Russell's behalf that Adams had not in fact visited her fifth floor apartment on the day of the shooting, as Adams had claimed.

The state offered evidence that on certain occasions officers spoke with witnesses and then took investigative steps. For example, Detective McNally testified that people reported to him on the night of the shootings that Russell may have been involved. Tr. 170. Defense counsel objected to this testimony, but did not object again after the court issued a limiting instruction that the jury was to consider this evidence not for its truth, but only as background information to explain the actions of the police officers. Tr. 171.

The court also admitted testimony that another witness, Kinte McKenzie, was arrested on criminal charges and was interviewed immediately prior to his release about the shooting at the Williams Avenue building. After the interview, McKenzie viewed a lineup that included Russell. The police were not able to locate McKenzie to testify at trial. Though McKenzie's statements, if any, to the police at the lineup were not elicited, Detective Thomas

Maher testified that there was "further police action taken relating to Mr. Russell" after the lineup. Tr. 440. Defense counsel objected to this testimony before it was offered, but did not further object after the court issued a limiting instruction. *See* Tr. 425-29.

On October 16, 2001, a jury found Russell guilty of murder in the second degree and two counts of criminal possession of a weapon in the second degree. He was sentenced to concurrent terms of 25 years to life imprisonment for the murder charge and four and one-half to nine years on each weapons charge.

2. *The Direct Appeal*

On appeal to the New York Supreme Court, Appellate Division, Second Department, Russell argued that (1) the verdict was against the weight of the evidence; (2) he was deprived of a fair trial by the improper admission of hearsay testimony; (3) he was deprived of a fair trial by the improper admission of Adams's prior consistent statement; and (4) his sentence was excessive.

On October 12, 2004, the Appellate Division unanimously affirmed the conviction and sentence. *People v. Russell*, 783 N.Y.S.2d 823 (2d Dep't 2004). The court exercised its factual review power to find that the verdict was not against the weight of the evidence, noting that "[r]esolution of issues of credibility, as well as the weight to be accorded the evidence presented, are primarily questions to be determined by the trier of fact, who saw and heard the witnesses." *Id.* The court also found that Russell's sentence was not excessive. *Id.* Finally, the court rejected the hearsay and prior consistent statement claims as being unpreserved for appellate review. *Id.*

On March 11, 2005, the Court of Appeals denied leave to appeal from the

Appellate Division's ruling. *People v. Russell*, 4 N.Y.3d 835 (2005) (Ciparick, J.).

3. *The Motion for a Writ of Error Coram Nobis*

By *pro se* motion dated March 14, 2006, Russell moved for a writ of error *coram nobis*, arguing that his appellate counsel was ineffective for failing to argue on appeal that Russell's trial counsel had been ineffective by failing to preserve the claim of improperly admitted hearsay testimony.

On July 18, 2006, the Appellate Division denied Russell's motion. *People v. Russell*, 817 N.Y.S.2d 910 (2d Dep't 2006).

4. *The Instant Petition*

In the instant petition, dated October 11, 2006, Russell advances the same arguments he raised on direct appeal.[1]

DISCUSSION

A. <u>The Governing Legal Principles</u>

1. *The AEDPA Standard*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. *See* 28 U.S.C. § 2254(d). Under the AEDPA standard, the reviewing court may grant habeas relief only where the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," or where the petitioner presents clear and convincing evidence to rebut the

[1] Strictly speaking, claims one and four (the weight of the evidence claim and the excessive sentence claim) have not been exhausted, as Russell's letter seeking leave to appeal to the New York Court of Appeals did not seek review of those issues. And those issues are by now procedurally barred in state court. Nevertheless, I address those issues on the merits.

presumption that state court findings of fact are correct. *See* 28 U.S.C. § 2254(d)(2); § 2254(e)(1). Habeas relief is also warranted if the state court's adjudication of the federal claim on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[2]

A state court decision is an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Furthermore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist*, 260 F.3d at 93 (citing *Williams*, 529 U.S. at 411); *see also Yarborough v. Gentry*, 540 U.S.1, 4 (2003) (per curiam) ("Where . . . the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable.").

2. *Procedural Default*

Even if a petitioner's claim meets the rigorous standard described above, habeas relief may be precluded if the state court has explicitly and actually relied upon a procedural bar as a basis upon which to deny the claim. *See Harris v. Reed*, 489 U.S. 255, 261-63 (1989); *Galarza v. Keane*, 252 F.3d 630, 637 (2d Cir. 2001). Where there has been actual reliance upon procedural default to dispose of the claim, there is an "adequate and independent state ground"

---

[2] Habeas relief is also warranted where the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). That subsection is not relevant to Russell's challenge.

for the judgment, prohibiting federal habeas review. *See Harris*, 489 U.S. at 261; *Levine v. Comm'r of Corr. Servs*., 44 F.3d 121, 126 (2d. Cir.1995). *But see Lee v. Kemna*, 534 U.S. 362, 376, 381 (2002) (noting the existence of a "small category" of "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question").

If a state appellate court rejects a claim as procedurally defaulted, the claim may be considered on federal habeas review only upon a showing of cause and prejudice, or upon a showing that a miscarriage of justice will result if the claim is not reviewed. *See Coleman*, 501 U.S. at 750; *Teague v. Lane*, 489 U.S. 288, 298 (1989). A petitioner may establish cause by showing "'that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials . . . made compliance impracticable.'" *Coleman*, 501 U.S. at 753 (ellipses in original) (internal quotation marks omitted) (quoting *Murray v. Carrier*, 477 U.S. 478, 492 (1986)). To satisfy the prejudice requirement, the alleged error must have worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks omitted). If the petitioner cannot show cause, the procedural default may nonetheless be excused if a fundamental miscarriage of justice would result from a failure to entertain the claim, *i.e*., the petitioner "is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). Such miscarriages of justice are "extremely rare," and this exception to the general default rule should be applied only in "extraordinary circumstances." *See Sweet v. Bennett*, 353 F.3d 135, 142 (2d Cir. 2003) (citing *Schlup*, 513 U.S. at 321-22).

B. Russell's Claims

1. *The Weight of the Evidence Claim*

Russell argued on direct appeal, and continues to argue before me, that the jury's verdict in his case was against the weight of the evidence. He argues that the state's two primary witnesses lacked credibility due to their criminal histories and motive to curry favor with the prosecutor, and that the ballistics evidence was itself inadequate to convict.

According to New York law, a weight of the evidence claim involves a factual inquiry into whether the trier of fact "has failed to give the evidence the weight it should be accorded" by weighing the relative probative force of conflicting evidence. *People v. Bleakley*, 515 N.Y.S.2d 761 (1987). Though New York law grants state appellate courts the right to evaluate a weight of the evidence claim, *see* N.Y. Crim. Proc. Law § 470.15, federal courts are not empowered to grant habeas relief based upon the weight of the evidence. *Garbez v. Greiner*, 2002 WL 1760960, at *8 (S.D.N.Y. 2002) ("A federal habeas court cannot address weight of the evidence claims because a challenge to a verdict based on the weight of the evidence is different from one based on the sufficiency of the evidence. Specifically, the weight of the evidence argument is a pure state law claim . . . whereas a legal sufficiency claim is based on federal due process principles.") (internal citations omitted).

A *sufficiency* of the evidence claim is subject to federal habeas corpus review, and it calls for an inquiry into "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under this standard, the testimony of Adams and Brown was, by itself, sufficient to support the jury's guilty verdicts. *See*

*United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986) (in considering sufficiency of the evidence claims, reviewing court must "resolve all issues of credibility in favor of the prosecution"). Moreover, that testimony was corroborated by the fact that the guns used in the shooting were recovered from the apartment of Russell's girlfriend, who lived next door to Russell himself.

Accordingly, I reject Russell's weight of the evidence claim because it is not cognizable on federal habeas corpus review. To the extent his claim challenges the sufficiency of the evidence, it is meritless.

2. *The Improper Hearsay Claim*

Russell also argues that he was denied a fair trial due to the improper admission of hearsay testimony. He asserts that the admission of testimony that law enforcement officials pursued Russell as a suspect after canvassing the building immediately following the shooting and after interviewing Kinte McKenzie creates an implication that the interviewees identified Russell as a perpetrator, and that such information was thought by the police to be truthful. Because he did not have the opportunity to cross-examine those interviewees at trial, Russell asserts that his Sixth Amendment Confrontation Clause rights, guaranteed to him through the Fourteenth Amendment, were violated at trial. Respondent counters that Russell's hearsay claim is procedurally barred, since the Appellate Division rejected the claim as unpreserved for appellate review. I agree that the claim is indeed procedurally barred, but I reject it on the merits.

Hearsay is an out-of-court statement offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). A statement does not implicate the Confrontation Clause unless it is offered for its truth. *See United States v. Paulino*, 445 F.3d 211, 216-17 (2d Cir. 2006) (statement admitted "to aid the jury in understanding the course of events"); *United States v.*

*Pedroza*, 750 F.2d 187, 200 (2d Cir. 1984) ("When statements of an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters with the understanding or intent with which certain acts were performed.").

The testimony at issue was not admitted for a hearsay purpose. Detective McNally's canvassing of the building on the night of the shootings was accompanied by an instruction that the information he received (*i.e.*, that Russell was involved) was admitted not for the truth of those assertions by persons in the building, but rather to explain the subsequent actions of the police, *see* Tr. 171, specifically, why they sought the consent of Christine Adams to search her fifth floor apartment. Although those actions could adequately have been explained without eliciting (at least explicitly) the fact that residents had identified Russell as a participant, I cannot conclude that the testimony, accompanied as it was by the limiting instruction, deprived Russell of either his right to confront witnesses or his right to a fair trial.

Similarly, Detective Maher's testimony about McKenzie's statements did not violate those rights. First, I disagree with Russell that the testimony that "further police action" was taken related to Russell after McKenzie viewed the lineup *necessarily* implied that McKenzie identified Russell from the lineup. There was in fact additional information available to the police at the time. More importantly, the testimony about Maher's interview of McKenzie was preceded by an objection, Tr. 425, and an instruction, Tr. 429, limiting the use of the testimony to explaining the actions of the police. (The limiting instruction with regard to the challenged testimony of both McNally and Maher was reiterated during the final charge. Tr. 824.) Again, I have doubts that an adequate explanation of the police officers' conduct, or of the

"gap between the ... crime ... and the ... apprehension," Tr. 426, required even an implication that McKenzie had identified Russell, but the testimony does not even approach the type of evidentiary or confrontation-based harm that would warrant habeas relief.

3. *The Prior Consistent Statement Claim*

Russell continues to challenge the admission of the prior consistent statement of Joanne Adams. The issue arose as follows. On direct examination, Adams testified that, after the shootings, she saw Russell leave her daughter's fifth floor apartment. Tr. 520. This was important evidence, as the weapons used in the shooting were recovered that night from that apartment. On cross-examination of Adams, Russell elicited first that Adams did not see any guns after she heard the shots ring out in fourth floor hallway. Tr. 538. Russell followed that testimony by reading from Adams's grand jury testimony, in which she stated that she had seen Russell run into her daughter's fifth floor apartment with all three guns (presumably after the shootings). Tr. 539. The denouement of this aspect of the cross was the question, "So it's two different stories, right, Miss Adams?" Tr. 540.

The testimony challenged on this petition was given on redirect, when Adams was asked whether she had told Detective Maher a year prior to the grand jury testimony that, after the shootings, she had seen Russell leave her daughter's fifth floor apartment. She had, and the prior statement was obviously admissible to shore up Adams's credibility on that key point. It may be true, as Russell argues, that the prior consistent statement to Maher did not predate the onset on Adams's alleged motive to curry favor with the police, and that an instruction limiting its use to assessing Adams's credibility might have been appropriate. But in the circumstances of this case, where the content of the prior consistent statement is identical to the testimony offered

by the declarant at trial, and the declarant is subjected to a thorough cross-examination, the absence of such an instruction would no doubt be harmless even on direct review, *see United States v. Vargo*, 185 Fed. Appx. 111, 114 (2d Cir. 2006); it certainly does not satisfy the more stringent standard for habeas relief. *See Dunnigan v. Keane*, 137 F.3d 117, 126-27 (2d Cir. 1998).[3]

4. *The Excessive Sentence Claim*

Russell claims that his sentence, a 25-year to life term of imprisonment, is harsh and excessive. This claim is without merit. The sentence falls within the maximum sentence authorized by New York law. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." (citations omitted)). Moreover, given the seriousness of the crime, the sentence cannot reasonably be characterized as grossly disproportionate, and thus it presents no constitutional infirmity. *See Ewing v. California*, 538 U.S. 11 (2003).

[3] Respondent contends that this claim is procedurally barred, citing the Appellate Division's decision that holds as much. I disagree. The issue could not have been better preserved by trial counsel. *See* Tr. 565-68. Respondent's argument to the contrary, which is lifted from the People's brief to the Appellate Division, amounts to a sleight of hand.

CONCLUSION

For the foregoing reasons, the petition is denied. Because Russell has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue.

So ordered.

John Gleeson, U.S.D.J.

Dated: April 6, 2007
Brooklyn, New York